**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**3:22-cv-609-MOC**

| | |
|---|---|
| MARINE CLUB MANAGER, INC., | ) |
| EBRM RESURRECTION LLC, and | ) |
| ERIC BLUMENFELD, | ) |
| | ) |
| Petitioners, | ) |
| | ) |
| vs. | ) |
| | ) |
| | )         **ORDER** |
| | ) |
| RB COMMERCIAL MORTGAGE, LLC,| ) |
| | ) |
| | ) |
| Respondent. | ) |
| _____ | ) |

This matter is before the Court on Petitioners' Motions to Vacate, Modify, or Correct two
arbitration awards, Doc. Nos. 1, 39, and Respondent's Motions to Confirm the same two
arbitration awards, Doc. Nos. 14, 37. For the reasons stated herein, the Court **CONFIRMS** both
arbitration awards.

I.       **BACKGROUND**

         a.   **The Operating Agreement**

This case concerns the breach of a commercial agreement and an arbitration proceeding
that followed. There are three petitioners in this case. Petitioner Eric Blumenfeld ("Petitioner
Blumenfeld") is a real estate developer. The other two Petitioners, Marine Club Manager, Inc.
("Petitioner Manager") and EBRM Resurrection, LLC ("Petitioner EBRM"), are commercial
entities of which Blumenfeld is the sole owner or member. The one respondent, RB Commercial
Mortgage, LLC, is a commercial entity.

1

In November of 2014, Respondent, Petitioner Blumenfeld, and Petitioner Manager

formed a new commercial entity, Marine Club Associates, LLC ("Marine Club"). Marine Club's

intended purpose was to own and operate an apartment complex in Philadelphia, Pennsylvania

(the "Property"). As part of Marine Club's formation, Respondent, Petitioner Blumenfeld, and

Petitioner Manager executed an operating agreement titled Limited Liability Company

Agreement of Marine Club Associates, LLC (the "Operating Agreement"). See (Doc. No. 1-1).

Among other provisions, the Operating Agreement defined "Changeover Events," "Full

Recourse Events," and the consequences of each of those events occurring. Section 8.1 of the

Operating Agreement defines a "Changeover Event" as follows:

Changeover Events. The occurrence of any of the following events or circumstances shall
constitute a Changeover Event; provided however, that notwithstanding anything to the contrary
contained herein, any event, omission or circumstance listed below for which a cure period is
otherwise expressly provided in this Agreement shall not constitute a Changeover Event until the
expiration of such cure period.

    a) Failure to make a Minimum Distribution on the date due;
    b) Failure to pay the Required Redemption Amount on or before the Required
        Redemption Date;
    c) The Company's failure to maintain required insurance;
    d) The Operating Member's: (i) commission of a criminal act involving either moral
        turpitude or financial irregularity, or its conviction of a felonious criminal act, (ii)
        intentional misapplication of any funds derived from the Property, including
        without limiting the generality of the foregoing, security deposits, insurance
        proceeds and condemnation awards, (iii) fraud, intentional misrepresentation to
        the Capital Member, or gross negligence in the management of the Property, or
        (iv) liquidation or dissolution;
    e) Sponsor's material breach of a material representation made in connection with
        Capital Member's making the Capital Member's Initial Capital Contribution;
    f) The claim by Senior Mortgage Lender of the occurrence of an Event of Default
        under the Senior Mortgage, together with Senior Mortgagee's commencement of
        remedial action as a result of such claimed default;
    g) The Company (A) files a petition in bankruptcy or (B) is the subject of an
        involuntary petition in bankruptcy which involuntary petition (i) is not dismissed
        within sixty (60) days after the effective filing date thereof, and (ii) is not caused
        by Capital Member;

h) Failure to cause the Company to cease engaging in an activity, as requested by the Capital Member, which fails the income and asset tests as described in the REIT Covenants;

i) Any other breach by the Operating Member of its obligations under the Documentation that is not cured within 30 days (or, if such breach cannot be cured within 30 days, Operating Member fails to commence such cure within such 30 day period and to diligently prosecute the same to completion);

j) The death, long-term disability or adjudication as incompetent of Sponsor or the failure at any time of Sponsor to control the Operating Member (each or any a "Loss of Sponsor"). Operating Member acknowledges that the individual talents of Sponsor are basic and essential to the success of the development and operation of the Company. Notwithstanding the foregoing, if within thirty (30) days of the Loss of Sponsor the Operating Member proposes a substitute person to assume control of the Operating Member, and such person is approved by Capital Member in its reasonable sole discretion, then the Changeover Event shall not be deemed to have occurred.

If a Changeover Event occurs, Section 8.3 of the Operating Agreement defines the remedies at Respondent's disposal:

Remedies. Upon the occurrence of any Changeover Event, in addition to any other rights or remedies available to the Capital Member at law or in equity, the Capital Member shall be entitled to exercise any one or more of the following remedies:

a) The Capital Member may require that the Manager of the Company replace the Property Manager with a property manager acceptable to the Capital Member;

b) The Capital Member may replace the Manager of the Company with a person or entity selected by the Capital Member;

c) The Capital Member Preferred Return Rate will be increased by 7.0%;

d) Distributions shall be changed as set forth in paragraph 7.2(g);

e) To exercise control of the Company, including without limitation the making of Major Decisions, without the joinder or consent of the Operating Member as set forth in Section 4.1 hereof.

Section 13.2 of the Operating Agreement defines a Full Recourse Event as follows:

(i) Fraud, or material and intentional misrepresentation with respect to a material matter, by the Operating Member;

(ii) The occurrence of a Bankruptcy Event. A "Bankruptcy Event" shall include any of the following that occurs without the consent or cooperation of the Capital Member: (i) The Company or Sponsor voluntarily files for bankruptcy under the Bankruptcy Code; (ii) Company or Sponsor voluntarily becomes subject to any reorganization, receivership, insolvency proceeding, or other similar proceeding pursuant to any other federal or state law affecting debtor and creditor rights; (iii) The Property or any part

3

of the Property becomes an asset in a voluntary bankruptcy or becomes subject to any voluntary reorganization, receivership, insolvency proceeding, or other similar voluntary proceeding pursuant to any other federal or state law affecting debtor and creditor rights; (iv) An order of relief is entered against Company or Sponsor pursuant to the Bankruptcy Code or other federal or state law affecting debtor and creditor rights in any involuntary bankruptcy proceeding initiated or joined in by, or as a result of solicitation by, the Operating Member, Sponsor or any Affiliate thereof; (v) An involuntary bankruptcy or other involuntary insolvency proceeding is commenced against Company or Guarantor but only if Company or Guarantor has failed to use commercially reasonable efforts to dismiss such proceeding or has consented to such proceeding. "Commercially reasonable efforts" will not require any direct or indirect interest holders in Company or Guarantor to contribute or cause the contribution of additional capital to Company or Guarantor;

(iii) Interference with Capital Member's exercise of its rights or remedies arising as a result of the occurrence of a Changeover Event; provided, however, nothing herein shall be construed to prohibit the Operating Member from filing a lawsuit or counterclaim for money damages, or any answer, in any such case to challenge the validity of the action taken or breach asserted in order to seek damages resulting therefrom;

(iv) Breach of restrictions contained in this Agreement or the Senior Mortgage Loan Documents on (i) transfer of the Property or interests therein (other than by virtue of a Minor Lease), or (ii) transfer of interests (direct or indirect) in the Company;

(v) Breach of provisions in this Agreement or the Senior Mortgage Loan Documents limiting the business activities in which the Company may engage or the assets that it may own; or

(vi) Company fails to comply with any provision of either the Senior Mortgage Loan documents or Section 15.20 hereof commonly referred to as "SPE Covenants" and a court of competent jurisdiction holds or determines that such failure or combination of failures is the basis, in whole or in part, for the substantive consolidation of the assets and liabilities of the Company with the assets and liabilities of any other person or entity. Notwithstanding the forgoing, for so long as Sponsor is a guarantor under the Senior Mortgage Loan Documents, any indebtedness of Sponsor to Capital Member resulting under this Section 13, either now or hereafter existing, together with any interest thereon, shall be, and such indebtedness is, subordinated to any claim of the Senior Lender against Sponsor under the Senior Mortgage Loan Documents.

If a Full Recourse Event occurs, in accordance with Section 13.2, Petitioner Blumenfeld becomes "fully liable for the repayment of the Required Redemption Amount" and Respondent's "Investment shall thereupon be redeemed."

Coinciding with the formation of Marine Club, Petitioner Blumenfeld altered his

ownership of Marine Club through a senior mortgage loan on the Property (the "Senior Loan"). The terms of the Senior Loan were Respondent would invest $3,350,000 in preferred equity in exchange for an 8% membership equity interest in Marine Club with Mr. Blumenfeld retaining the remaining equity. The Operating Agreement contained a "Voluntary Redemption" provision which allowed Marine Club to buy-out Respondent's preferred equity interest in Marine Club. (Doc. No. 1-1 at § 12.1).

### b. Alleged Violation of the Operating Agreement

Several years after Marine Club's formation, Respondent accused Petitioners of violating the Operating Agreement. These violations, according to Respondent, constituted Changeover Events and Full Recourse Events. The alleged violations constituting Changeover Events included refusing to make payments to Respondent required under the Operating Agreement; failing to maintain security deposits in compliance with the relevant law; defaulting on the loan used to acquire the Property; and intentionally diverting funds away from contractually required accounts. Additionally, constituting Full Recourse Events, Petitioners allegedly attached Respondent's signature page to a document without Respondent's permission and then presented that document as a true and correct document to a lender on two loans.

After alleging Changeover Events and Full Recourse Events had occurred, Respondent sought to enforce its rights under the Operating Agreement. Petitioners disputed that any Changeover Events or Full Recourse Events transpired, and counterclaimed that even if they had, Respondent had materially breached the implied and express provisions of the Operating Agreement prior to the alleged events such that any further performance by Petitioners is discharged until Respondent cures its material breaches.

### c. Initial Arbitration

Under the Operating Agreement, the members of Marine Club agreed to litigate all disputes, controversies, and claims arising or relating to the Operating Agreement in "binding arbitration administered by the AAA in accordance with its Commercial Arbitration Rules." (Doc. No. 1-1 at § 15.19). Consequently, Respondent and Petitioners entered arbitration to determine whether any Changeover Events or Full Recourse Events had occurred and to litigate Petitioners' counterclaims of material breach.

The AAA appointed Barbara B. Weyher, Esq. (the "Arbitrator") to serve as arbitrator. The Arbitrator held an evidentiary hearing in Charlotte, North Carolina, on May 2 and May 3 of 2022. The hearing was briefly resumed via Zoom on June 1, 2022, pursuant to the agreement of both Petitioners and Respondent. At the hearing, Petitioners and Respondent called witnesses to testify, cross-examined the witnesses that testified, and introduced documents into the record. Importantly, each Party was permitted to introduce the documents they wished, and the Arbitrator did not refuse to admit a single document while the Parties were assembled, either in person or by Zoom. In total, Respondent admitted 258 exhibits, and Petitioners admitted 150 exhibits. Altogether, the two sides submitted over 4,000 pages of documents as evidence.

The Arbitrator entered a partial award on August 9, 2022. (Doc. No. 1-12). The partial award held that: Respondent was entitled to a Declaratory Judgement that multiple Changeover Events and Full Recourse Events had occurred; Respondent was entitled to exercise the remedies for a Changeover Event and Full Recourse Event contained in the Operating Agreement; Petitioner Blumenfeld and Petitioner Manager were liable to Respondent in the amount of $5,302,369.93; and that Petitioners did not prove any of their counterclaims by the weight of the evidence. (Doc. No. 15-9). The Arbitrator issued a clarification of the Award on September 20, 2022, instructing that Petitioner Blumenfeld was not permitted to redeem Respondent, in

accordance with a Full Recourse Event occurring, until the Senior Mortgage Loan of the Operating Agreement was paid. (Doc. No. 15-10). Lastly, finding that Respondent was the prevailing party, the Arbitrator requested briefing on the issue of awarding attorneys' fees. The Arbitrator issued a final award, on September 26, 2022, incorporating the partial award, the clarification of award, and a determination that Respondent was owed $1,795,846.02 in reasonable attorneys' fees. (Doc. No. 14-2).

### d. Appellate Review of the Arbitration

Under the Operating Agreement, either Party could seek appellate review of an arbitral award in front of "an arbitration review panel comprised of three (3) arbitrators. . . [which] shall be entitled to review all findings of fact and conclusions of law in whatever manner it deems appropriate and may modify the award of the initial arbitrator(s) in its discretion." (Doc. No. 14-1 at § 15.19).

Petitioners requested review of the final award. The review was administered by the AAA on October 18, 2022. The AAA appointed Hon. E. Leo Milonas, Hon. Frank W. Bullock, Jr., and Hon. Robert N. Hunter, Jr. as the arbitrators comprising the review panel (the "Review Panel"). (Doc. No. 14-3). The Review Panel received briefing from Respondent and Petitioners regarding Petitioners' claims of error in the final award issued by the initial Arbitrator. However, no oral argument was conducted. On January 17, 2023, the Review Panel issued their decision. The Review Panel rejected all of Petitioners' allegations of error and "affirm[ed] and adopt[ed] the Arbitrator's Findings and Conclusions [contained in the final award.]" (Doc. No. 15-11 at 3).

### e. Appellate Arbitration Fees

After the Review Panel issued their initial decision on January 17, 2023, both parties submitted briefs to the Review Panel regarding the award of attorneys' fees and costs related to

7

the appeal of the Arbitrator's final reward. Respondent requested $188,383.95 in attorneys' fees and $2,507.13 in costs from the appeal of the Arbitrator's final award. Petitioners opposed this award of fees and costs, contending that the amounts sought are excessive, the fee rates are excessive of what is commercially necessary, and that time spent on the appeal was excessive.

The Review Panel issued a decision on April 4, 2023, which reduced the fees sought, due to imperfection in the evidence submitted by Respondent. Ultimately, the Review Panel awarded Respondent $75,000.00 in attorneys' fees and $3,236.83 in costs. (Doc. No. 37-2).

### f. Motions to Vacate, Modify, or Correct the Arbitration Award

Pursuant to the Federal Arbitration Act (FAA), a party who loses in arbitration may move to vacate, modify, or correct the arbitration award in Federal Court. 9 U.S.C. § 12. At the same time, a party who wins at arbitration may move to confirm the award at any time during the year immediately following the award. 9 U.S.C. § 9.

There are two awards related to this case. The first was issued on January 17, 2023, when the Review Panel adopted and affirmed the Arbitrator's final award on the merits of the matter. As mentioned above, this first award adjudicated the merits of the parties' claims and defenses and included an award of attorneys' fees and costs to Respondent. Petitioners filed a Motion to Vacate, Modify, or Correct the first award on November 7, 2022, while the Review Panel's decision was still pending. (Doc. No. 1). However, now that the Arbitrator's final award has been affirmed and adopted *in toto* by the Review Panel, and the motion no longer depends on future uncertainties, the Motion to Vacate, Modify, or Correct is ripe for disposition. The first award is also subject to a Motion to Confirm which was timely filed by Respondent on January 23, 2023. (Doc. No. 14).

The second award, issued on April 4, 2023, deals solely with Respondent's right to

8

attorneys' fees and costs incurred during appellate review of the final award. Petitioners have filed a Motion to Vacate, Modify, Correct this second award. (Doc. No. 39). Respondent has also filed a Motion to Confirm the second award. (Doc. No. 37).

## II.     STANDARD OF REVIEW

The Fourth Circuit has made it clear that judicial review of an arbitration award is "among the narrowest known at law." AO Technsnabexport v. Globe Nuclear Servs. & Supply GNSS, Ltd., 404 Fed. Appx. 793, 797 (4th Cir. 2010). Indeed, "judicial review of an arbitration award in federal court 'is severely circumscribed.'" Wachovia Sec., LLC v. Brand, 671 F.3d 472, 478 (4th Cir. 2012) (quoting Apex Plumbing Supply, Inc. v. U.S. Supply Co., 142 F.3d 188, 193 (4th Cir. 1998)). "[T]he scope of review of an arbitrator's ... decision is among the narrowest known at law because to allow full scrutiny of such awards would frustrate the purpose of having arbitration at all — the quick resolution of disputes and the avoidance of the expense and delay associated with litigation." Apex Plumbing Supply, 142 F.3d at 193.

In reviewing an arbitration award, "'a district or appellate court is limited to determin[ing] whether the arbitrators did the job they were told to do -- not whether they did it well, or correctly, or reasonably, but simply whether they did it.'" Williamson Farm v. Diversified Crop Ins. Servs., 917 F.3d 247, 253 (4th Cir. 2019) (quoting Three S Del., Inc. v. DataQuick Info. Sys., Inc., 492 F.3d 520, 527 (4th Cir. 2007)). Accordingly, an arbitration award "is enforceable even if the award resulted from a misinterpretation of law, faulty legal reasoning or erroneous legal conclusions." Id. (quoting Richmond, Fredericksburg & Potomac R.R. Co. v. Transp. Commc'ns Int'l Union, 973 F.2d 276, 281 (4th Cir. 1992)).

Convincing a federal court to vacate an arbitral award "is a herculean task." Warfield v. Icon Advisers, Inc, 26 F.4th 666, 669 (4th Cir. 2022). There is a strong presumption in favor of

9

confirming arbitration awards under the FAA, and any party seeking to overturn an arbitration award faces a "heavy burden." Three S Del., Inc., 492 F.3d at 527. To prevail, a party seeking vacatur "must clear a high hurdle." Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 671 (2010). "It is not enough for petitioners to show that the [Arbitrator] committed an error—or even a serious error." Id. "It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable." Id. (quoting Major League Baseball Players Assn. v. Garvey, 532 U.S. 504, 509 (2001)).

## III. DISCUSSION

The FAA provides that a court may only vacate an arbitration award on one of the following grounds:

> (1) where the award was procured by corruption, fraud, or undue means;
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

Three S Del., Inc., 492 F.3d at 527 (citing 9 U.S.C. § 10(a)). In addition to the very narrow statutory grounds for vacating an arbitral award described in 9 U.S.C. § 10(a), the Fourth Circuit has recognized, "either 'as an independent ground for review or as a judicial gloss on the [narrow] enumerated grounds for vacatur set forth' in § 10(a), that a district court may vacate an arbitral award that rests upon a 'manifest disregard' of the law. Warfield, 26 F.4th at 669–70 (quoting Brand, 671 F.3d at 483). To establish manifest disregard, a party must demonstrate: "(1) the disputed legal principle is clearly defined and is not subject to reasonable debate; and (2) the

10

arbitrator refused to apply that legal principle." <u>Jones v. Dancel,</u> 792 F.3d 395, 402 (4th Cir. 2015).

There are two disputed arbitral awards in this case. Respondent has filed motions to confirm each of the two awards, and Petitioners have filed motions to vacate, modify, or correct each of the two awards. This Court will address the awards one at a time.

### a. First Award: Final Award on the Merits of the Matter

The first award, issued on January 17, 2023, is the Review Panel's adoption and affirmation of the Arbitrator's final award on the merits of the matter. This first award adjudicated the merits of the parties' claims and defenses and included an award of attorneys' fees and costs to Respondent.

According to Respondent, the first award should be confirmed because Respondent has satisfied the procedural requirements to confirm a final award, and "there are no grounds under 9 U.S.C. §§ 10 or 11 that warrant vacation, modification, or correction of the Award." (Doc. No. 15 at 6); <u>See</u> <u>SmartSky Networks, LLC v. Wireless Sys. Sols., LLC,</u> 584 F. Supp. 3d 36, 53 (M.D.N.C. 2022) ("[T]o prevail on a motion to confirm a final award, the movant must petition the court within one year of the arbitration award, provide notice to the adverse party, and file the award order, the arbitration agreement, and any time extension with the motion").

Petitioners oppose confirmation of the award and contend the Court should vacate or modify the first award for several reasons.

### i. Refusal to Postpone the Final Arbitration Hearing

First, Petitioners argue the award should be vacated, pursuant to 9 U.S.C. § 10(a)(3), because the Arbitrator was guilty of misconduct in refusing to postpone the final arbitration hearing to permit the parties to resolve the threshold issue of whether Petitioner Blumenfeld had

11

voluntarily redeemed Respondent. (Doc. No. 1 at 12).

Arbitrators are only guilty of misconduct, worthy of vacatur, if their refusal to postpone a hearing "deprives a party to the proceeding of a fundamentally fair hearing." Three S Del., Inc., 492 F.3d at 531. Indeed, "[a]n arbitrator typically retains broad discretion over procedural matters and does not have to hear every piece of evidence that the parties wish to present." Int'l Union, United Mine Workers of Am. v. Marrowbone Dev. Co., 232 F.3d 383, 389 (4th Cir. 2000).

Here, Petitioners argue there was a dispute as to whether Petitioner Blumenfeld had already voluntarily redeemed Respondent's equity interest in Marine Club; this dispute was a threshold issue to resolution of the rest of Respondent's arbitration claims; and Petitioners were deprived a fair hearing because the hearing was not postponed to allow for resolution of this threshold voluntary redemption dispute.

However, the Arbitrator's refusal to postpone the hearing did not deprive Petitioners from resolving the voluntary redemption dispute. In fact, the Arbitrator allowed the parties to argue the voluntary redemption dispute, along with each party's other claims, at the final hearing. Petitioners note that the parties had no "opportunity to engage in any discovery as to this new claim included in the arbitration one business day before the hearings." (Doc. No. 1 at 10). However, this short notice did not result in an unfair proceeding. District courts are not empowered to "second-guess an Arbitrator's discovery decisions […] even if there is evidence that the arbitrator erred." White v. Four Seasons Hotel & Resorts, 244 F. Supp. 3d 1, 10 (D.D.C. 2017). By holding a hearing without allowing for discovery on the voluntary redemption dispute, the Arbitrator exercised their "full authority to determine whether or not certain evidence would prove relevant to their determination." ARMA, S.R.O. v. BAE Sys. Overseas, Inc., 961 F. Supp.

12

2d 245, 264 (D.D.C. 2013). As the Arbitrator explained, she did not believe discovery was necessary because "whether a voluntary redemption has occurred is an issue of contractual interpretation, which under Delaware law is treated as a question of law." (Doc. No. 16-1 at 16) (citing <u>OSI Sys., Inc. v. Instrumentarium Corp.</u>, 892 A.2d 1086, 1090 (Del. Ch. 2006)). Moreover, Petitioners have not identified any pertinent and material evidence they were unable to introduce at the hearing to fully litigate the voluntary redemption dispute.

The Arbitrator's refusal to postpone the hearing did not deprive Petitioners of a fundamentally fair hearing, because Petitioners were still allowed to argue the voluntary redemption dispute, the Arbitrator exercised their authority over excluding evidence, and it does not appear the Arbitrator excluded pertinent and material evidence to resolve the voluntary redemption dispute at the hearing. Therefore, this ground for vacatur will be denied.

### ii.    Exercising Jurisdiction Over the Voluntary Redemption Dispute

Second, Petitioners argue the Court should vacate the first award pursuant to 9 U.S.C. § 10(a)(3) and (4) or modify the award pursuant to § 11(b) because the arbitrator was guilty of misconduct and misbehavior prejudicial to Petitioners and exceeded the scope of her powers by unilaterally declaring that she had jurisdiction over the voluntary redemption dispute, a new claim that had not been previously raised by either party in the arbitration.

However, the Arbitrator did not unilaterally declare that she had jurisdiction over the voluntary redemption issue. In fact, the Arbitrator did not address the voluntary redemption issue until Petitioners raised the issue at the evidentiary hearing. Petitioners mentioned the voluntary redemption issue in their opening statement, argued the issue at the hearing, and even requested that the Arbitrator resolve the voluntary redemption issue. <u>See</u>, <u>e.g.</u>, (Doc. No. 1 Ex. 11–13) (opening statement); (Doc. No. 16 Ex T. 236:16–238:22; 241:17–242:5) (questioning

13

Respondent witness about the consequences of a voluntary redemption); (Doc. No. 16 Ex. U) (proposed issues for determination).

The evidence shows that the voluntary redemption issue was related to the Operating Agreement and was raised by Petitioners. Therefore, the Arbitrator's decision to address the issue was simply the Arbitrator doing their job, and a far cry from misconduct or exceeded authority. Oxford Health Plans LLC v. Sutter, 569 U.S. 564, 569 (2013) ("Only if the arbitrator act[s] outside the scope of his contractually delegated authority—issuing an award that simply reflect[s] [his] own notions of [economic] justice rather than draw[ing] its essence from the contract—may a court overturn his determination.") (internal quotations omitted). Accordingly, this ground for vacatur will also be denied.

### iii.    Partiality of the Arbitrator

Third, Petitioners contend the first award should be vacated pursuant to 9 U.C.S. § 10(a)(2) because the totality of each of the previously mentioned grounds for vacatur reflects evident partiality by the arbitrator against Petitioners.

A party seeking vacatur pursuant to 9 U.C.S. § 10(a)(2) must demonstrate "that a reasonable person would have to conclude that an arbitrator was partial to the other party to the arbitration." ANR Coal Co. v. Cogentrix of N. Carolina, Inc., 173 F.3d 493, 500 (4th Cir. 1999) (quoting Consol. Coal Co. v. Loc. 1643, United Mine Workers of Am., 48 F.3d 125, 129 (4th Cir. 1995)).

Here, Petitioners have not demonstrated that the Arbitrator had a personal interest, pecuniary or otherwise, in the proceeding, and have not demonstrated that the Arbitrator had any direct relationship with Respondent outside of the arbitration that would foster favoritism towards Respondent. Id. (specifying factors for assessing claim of arbitrator partiality).

14

Therefore, Petitioner's third argument for vacatur of the award will also be rejected.

### iv.    Interpretation of the Operating Agreement

Lastly, Petitioners argue that the Court should vacate the first award because the Arbitrator failed to follow binding Delaware law in construing and interpreting the plain language of the Operating Agreement and binding Delaware law regarding material breach. However, "the sole question for [a district court] is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." Oxford Health Plans LLC, 569 U.S. at 569. Here, the Arbitrator's award drew "its essence from the contract" rather than "simply reflect[ing] [their] own notions of [economic] justice." E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17, 531 U.S. 57, 62 (2000). Therefore, even if the Arbitrator made an error in their interpretation of the law, the arbitral award must be confirmed.

Likewise, Petitioners' argument that the Court should vacate the first award because it awards unreasonable and unconscionable attorneys' fees to Respondent must be rejected. Petitioners have failed to show that the Arbitrator "issu[ed] an award that simply reflects [their] own notions of economic justice" or manifestly disregards the law. Id. Because the award is neither completely irrational nor manifestly disregards the law, it must be confirmed.

### b.  Second Award: Award of Attorneys' Fees and Costs Incurred During Appellate Review of the First Award

The second award, issued on April 4, 2023, is the Review Panel's grant of $78,236.83 ($75,000.00 in attorneys' fees and $3,236.83 in costs) to Respondent to cover attorneys' fees and costs incurred during appellate review of the first award. Respondent seeks to confirm the second award. (Doc. No. 37). Petitioners argue the second award should be vacated for numerous reasons. (Doc. No. 39).

15

### i.    Refusal to Provide Evidentiary Hearing or Discovery

First, Petitioners contend that this Court should vacate the second award pursuant to 9 U.S.C. § 10(a)(3), or modify it pursuant to § 11(b), because the Review Panel issued the second award without an evidentiary hearing, despite Petitioners' request for one, and without any opportunity for discovery, despite Petitioners' request for one.

As previously discussed, an Arbitrator is granted "full authority to determine whether or not certain evidence would prove relevant to their determination." <u>ARMA, S.R.O.</u>, 961 F. Supp. 2d at 264. Here, the Review Panel exercised that authority when it determined an evidentiary hearing and discovery were not necessary. Indeed, the Review Panel noted that the second award involved "matters for which [the Review Panel] were observers." (Doc. No. 37-2 at 2). This Court is not empowered to second guess the Review Panel's determination that their observations were sufficient evidence to issue the second award. <u>White</u>, 244 F. Supp. 3d at 10. Accordingly, this argument for vacatur, modification, or correction must be rejected.

### ii.    Interpretation of the Operating Agreement

Petitioners alternatively argue that the Court should vacate the second award because the Review Panel failed to follow binding Delaware law in construing and interpreting the plain language of the Operating Agreement.

Here, once again, "the sole question for [a district court] is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." <u>Oxford Health Plans LLC</u>, 569 U.S. at 569. The second award drew "its essence from the contract," and Petitioners have failed to show otherwise. <u>E. Associated Coal Corp.</u>, 531 U.S. at 62. Therefore, even if the Arbitrator made an error in their interpretation of the law, the arbitral award must be affirmed.

16

Similarly, Petitioners' argument that the Court should vacate the second award because it awards unreasonable and unconscionable attorneys' fees to Respondent must be rejected, because Petitioners have failed to show that the second award is completely irrational or manifestly disregards the law. Id. Because there is no reason to vacate, modify or correct the second award, it will be confirmed.

## IV.     CONCLUSION

In summary, because there are no grounds that warrant vacatur, modification, or correction of the first award or second award, both awards will be confirmed. Wells Fargo Advisors, LLC v. Watts, 858 F. Supp. 2d 591, 597 (W.D.N.C. 2012), aff'd in part, rev'd in part, 540 F. App'x 229 (4th Cir. 2013) ("On a motion to confirm an arbitrator's award, the court must grant such an order unless the award is vacated, modified or corrected as specified in Sections 10 and 11 of the FAA.") (quotations omitted).

## ORDER

**IT IS, THEREFORE, ORDERED** that the Respondent's Motions to Confirm the Arbitration Awards. Doc. Nos. 14, 37, are **GRANTED** and Petitioners' Motions to Vacate, Modify, or Correct the Arbitration Awards, Doc. Nos. 1, 39, are **DENIED**.

**IT IS SO ORDERED**.

Signed: July 31, 2023

Max O. Cogburn Jr
United States District Judge

17